NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 260207-U

NO. 4-26-0207

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 7, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* N.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 23JA82 |
| v. | ) | |
| Benjamin B., | ) | Honorable |
| Respondent-Appellant). | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Grischow and Cavanagh concurred in the judgment.

**ORDER**

¶ 1　　*Held*:　The appellate court granted appellate counsel's motion to withdraw and affirmed the judgment of the trial court terminating respondent's parental rights, finding the appeal presented no potentially meritorious issues for review.

¶ 2　　　　On January 20, 2026, the trial court terminated the parental rights of respondent, Benjamin B., to his minor child, N.D. (born in 2023). Respondent appealed, and counsel was appointed to represent him. Counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing that the appeal presented no potentially meritorious issues for review. Respondent did not file a response.

¶ 3　　　　We grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 4　　　　　　　　　　　　I. BACKGROUND

¶ 5　　　　On August 15, 2023, the State filed a petition for adjudication of wardship of N.D. The petition listed N.D.'s parents as Melissa M. and Corey D. It alleged that N.D. was neglected

and/or abused because, at the time of N.D.'s birth, Melissa and Corey had another child, E.D., who was removed from their care due to their substance abuse issues, and neither parent had made enough progress to have E.D. returned. See 705 ILCS 405/2-3(1)(b) (West 2024). The petition alleged that it was in the best interest of N.D. to be adjudged a ward of the court. On the same day, a temporary custody order was entered, placing N.D. in the care of the Illinois Department of Children and Family Services (DCFS).

¶ 6		At a hearing on October 19, 2023, Melissa and Corey admitted to the allegations in the State's petition. Based on the admissions, the trial court entered an order finding N.D. to be neglected in that he was in an environment injurious to his welfare.

¶ 7		On January 11, 2024, the trial court entered a dispositional order finding it was in N.D.'s best interest to be made a ward of the court. It found Melissa and Corey to be unfit based on "substance abuse issues that [had] legal consequences" and continued custody and guardianship of N.D. with DCFS. Additionally, the court noted that Corey had been excluded as the biological father of N.D. It ordered that DNA testing be completed on respondent.

¶ 8		At a permanency review hearing on August 15, 2024, the trial court stated that DNA testing had identified respondent as the biological father of N.D. The petition for the adjudication of wardship of N.D. was amended to include respondent. His address was listed as Robinson Correctional Center in Robinson, Illinois.

¶ 9		On September 18, 2025, the State filed a motion to terminate Melissa's, Corey's, and respondent's parental rights over N.D. With respect to respondent, the petition alleged that he was an unfit parent in that he (1) failed to make reasonable efforts to correct the conditions that were the basis for N.D.'s removal (750 ILCS 50/1(D)(m)(i) (West 2024)), (2) failed to make reasonable progress toward the return of N.D. within any nine-month period following the

adjudication of neglect (*id.* § 1(D)(m)(ii)), (3) failed to make reasonable progress toward the return of N.D. within any nine-month period following the initial nine-month period after the adjudication of neglect (*id.*), and (4) was depraved as the term is defined in the Adoption Act (*id.* § 1(D)(i)). The State specified that its petition related to the following nine-month periods: October 19, 2023, to July 19, 2024; July 19, 2024, to April 19, 2025; and April 19, 2025, to January 17, 2026.

¶ 10       On January 20, 2026, the trial court held a hearing on the State's petition. The State presented the testimony of Kasey Gooding, a former employee of Lutheran Child and Family Services of Illinois (LCFS). Gooding testified that N.D. was two years old at the time of the hearing and his half-brother E.D. was three years old. She stated that she began working with the family in April 2023. A service plan covering the period from October 2023 to April 2024 was admitted into evidence. Gooding explained that because respondent was incarcerated during this period, his only requirements under the plan were to complete DNA testing and cooperate with LCFS. She stated that he was compliant with these requirements.

¶ 11       Haileigh Rife, an employee of LCFS, testified that she began working with the family in July 2024. Three services plans authored by Rife were entered into evidence. The first covered the period from April 2024 to October 2024. Because respondent was released from incarceration in early October 2024, his requirements under this plan were only to cooperate with LCFS and complete an integrated assessment. Rife testified that respondent completed the assessment upon his release.

¶ 12       Under the second service plan, which covered the period from October 2024 to April 2025, respondent was given the following tasks: maintain a legal means of support and adequate housing, complete parenting classes, demonstrate positive parenting skills through visits with N.D., complete a mental health assessment and follow all recommendations, complete a

substance abuse assessment and follow all recommendations, complete domestic violence classes, and complete random toxicology screens. Rife testified that during this period, respondent had supervised visits with N.D., was engaged in mental health services, completed a substance abuse assessment, engaged in substance abuse counseling, and engaged in domestic violence classes. She stated that he did not begin parenting classes and did not submit to drug testing consistently. When he did submit to drug testing, he tested positive for tetrahydrocannabinol.

¶ 13       Under the third service plan, covering the period from March 2025 through September 2025, there were no changes to respondent's tasks. Rife testified that respondent was employed at this time, but his house was not appropriate for children, as there was no space for N.D. and "[t]here was an individual living in the home that didn't have a safe background." Respondent also had visits with N.D. suspended by court order in April 2025 due to his inconsistency in attending visits and his lack of progress in completing services. Rife stated that during this period, respondent was dropped from his parenting class due to nonengagement, was not engaged in mental health treatment, and remained inconsistent in submitting to drug tests. He was rated satisfactory with respect to his domestic violence classes, although he "struggl[ed] with some of his attendance." On cross-examination, Rife stated that respondent had reengaged with both parenting classes and mental health counseling since the completion of that service plan.

¶ 14       Respondent testified that he had been consistent with mental health treatment since April 2025 and had completed a 16-week parenting course the week before the hearing. He stated that he only had to take a final exam, which would "seal the parenting class." He stated that he lived with his girlfriend and her three children in a three-bedroom apartment. He proposed that if N.D. came to live with him, he could "condense my room, maybe move it out to the living room and make my room his room." He stated that prior to visits with N.D. being suspended, he saw

him once a week for two hours.

¶ 15    Following arguments from the parties, the trial court gave its decision. It found all three parents unfit. With respect to respondent, the court noted that at the time of adjudication in N.D.'s case, he was incarcerated, and therefore, "due to his own actions," he was "basically unable to be involved in any real services under the service plan." The court found that while respondent engaged in some services following his release, "he was never able to obtain the type of progress that's contemplated under the statute for minors to be considered to be placed back with a parent." It further noted that visits between respondent and N.D. were never able to progress to being unsupervised and eventually were suspended entirely due to respondent's lack of progress. The court stated, "[W]e're in a situation where for 27 consecutive months ***, there was never any substantial or reasonable progress made by any parent that would be a basis for either unsupervised visits or having the [minor] placed back into the custody of the parent." The court found respondent unfit based on the failure to make reasonable efforts or progress but declined to make any findings on the allegations of depravity.

¶ 16    The trial court immediately conducted a best-interest hearing. Rife testified that N.D. and E.D. were in a foster placement together with a relative of Corey. She stated that N.D. had been in this placement since his case opened and E.D. had been in the placement since October 2024. It was the only placement that N.D. had ever been in. She stated that she believed the minors to be bonded to their foster parent based on her observations. She stated, "Their interactions with the foster parent are very loving on both ends. When they follow [*sic*] themselves during visits, because they're roughhousing together, then they'll seek comfort in the foster parent."

¶ 17    When asked if either child had medical issues, Rife stated that E.D. needed to be tested for autism. She stated that the foster parent ensured that E.D. attended his daily educational

program and worked with the doctors regarding his testing. The following exchange took place between the State and Rife:

"Q. Has this foster placement shown a willingness to adopt this child?

A. Yes.

Q. Have they signed a permanency commitment for this child?

A. Yes.

Q. Is it the intent of [DCFS] and LCFS to have the minor remain in this foster placement and be adopted by this foster parent?

A. Yes."

¶ 18 The State presented no further evidence. During argument, the State asserted that the testimony had established that both minors were having their needs met in their foster home. It further noted that "[t]he foster placement [had] signed a permanency commitment form" and argued that it was in the minors' best interests to have the rights of their parents terminated so that this adoption could be completed. As a final note, it stated that respondent had not made the necessary progress to have N.D. returned to his care.

¶ 19 The trial court found:

"[The minors] are placed in a relative foster placement home. The minors appear to be bonded to the foster parent. The home appears to be safe and appropriate for the minors with all their needs, including any special needs, are being met there. It is considered a pre-adoptive relative placement. There has not been any evidence presented on this issue to show what relationship, if any, currently exists between either of the minors and any of the natural parents. Likewise, no evidence has been presented to show when, if ever, any of the natural parents would be able to provide

stable residence for any of the minors any time in the near future.

The Juvenile Court Act requires to try to achieve permanency for the minors as soon as that can be done. In this particular case, there is a plan in place through the agency to have the minors be adopted by the current foster parent. The court would not be in a position today to trade that opportunity for permanency required by the statute for some unknown date in the future.

The court therefore found it was in the minors' best interests to terminate all three parents' rights.

¶ 20  This appeal followed.

¶ 21          II. ANALYSIS

¶ 22  Respondent appealed the termination of his parental rights of N.D. Neither Melissa nor Corey are parties to this appeal.

¶ 23  Counsel for respondent has moved to withdraw, arguing that the appeal presents no meritorious issues for review. In addition to the motion, counsel filed a brief discussing the trial court's unfitness and best-interest findings and asserting that any argument that either finding was against the manifest weight of the evidence would be meritless. Respondent has not filed a response despite having the opportunity to do so.

¶ 24  We agree with counsel, grant the motion to withdraw, and affirm the trial court's judgment.

¶ 25          A. Unfitness

¶ 26  The involuntary termination of parental rights is a two-step process. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67. First, the State must prove by clear and convincing evidence that a parent is "unfit" under one of the grounds provided in section 1(D) of the Adoption Act. *Id.*; see 750 ILCS 50/1(D) (West 2024). After an unfitness finding, the trial court must determine if the

termination of parental rights is in the minor child's best interest. *J.H.*, 2020 IL App (4th) 200150, ¶ 67. We review an unfitness finding under the manifest-weight-of-the-evidence standard of review. *Id.* ¶ 68. Under this standard, we will not reverse the trial court's findings unless it is unreasonable, arbitrary, or not based on the evidence presented. *Id.* ¶ 85.

¶ 27 A parent may be found unfit for failing to make reasonable progress toward the return of the child during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress is an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps." *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 53. Reasonable progress exists where a court can conclude that a child can be returned to the parent in the near future. *Id.*

¶ 28 Here, the trial court found respondent unfit for failing to make reasonable progress toward the return of N.D. within the following nine-month periods: October 19, 2023, to July 19, 2024; July 19, 2024, to April 19, 2025; and April 19, 2025, to January 17, 2026. This finding was not against the manifest weight of the evidence. As the State needed to prove that respondent failed to make reasonable progress during only one of these periods, we will focus on the final nine-month time span, from April 19, 2025, to January 17, 2026. During this time, respondent was dropped from parenting classes due to nonengagement and had ceased engaging in mental health treatment. Although he testified that he later resumed both of these services, this does not negate his previous noncompliance. Indeed, due to respondent's failure to comply with the terms of his service plan and his inconsistency in visitation, his visits with N.D. were suspended and, at the time of the hearing on the petition to terminate parental rights, had not been reinstated. Further still, throughout this nine-month period, respondent remained inconsistent in submitting to drug testing, just as he had been since his release from jail over a year prior. Finally, respondent failed

to maintain housing that was appropriate for N.D. We acknowledge that respondent put forth at least some effort in completing his services. However, considering his overall lack of progress, the trial court could not have ordered N.D. returned to respondent's care in the near future. Therefore, we agree with counsel that no nonfrivolous argument may be raised that the trial court's finding of unfitness was against the manifest weight of the evidence.

¶ 29     Because the statutory grounds of unfitness are independent, we may affirm the trial court's unfitness finding where the evidence supports a finding of unfitness as to any of the alleged grounds. *Id.* ¶ 51. Because we affirm the trial court's finding of unfitness for lack of reasonable progress, we need not address its finding that respondent was also unfit for failing to make reasonable efforts to correct the conditions that brought N.D. into care.

¶ 30                                B. Best Interest

¶ 31     When making a best-interest determination, a court is required to consider the following factors within the context of the child's age and developmental needs:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

Additionally, a court may also consider the likelihood of a child being adopted when making its

decision. *In re Aiden M.*, 2025 IL App (5th) 250550-U, ¶ 15. No single best-interest factor is dispositive. See 705 ILCS 405/1-3(4.05) (West 2024). While a trial court must consider each statutory factor, it need not reference each individually in its decision. *Aiden M.*, 2025 IL App (5th) 250550-U, ¶ 15. The State must prove that termination of parental rights is in a child's best interest by a preponderance of the evidence. *J.H.*, 2020 IL App (4th) 200150, ¶ 85. We will reverse the trial court's best-interest finding only where it is against the manifest weight of the evidence. *Id.*

¶ 32        Counsel on appeal asserts that no meritorious argument may be raised that the trial court's best-interest finding was against the manifest weight of the evidence. In support of this position, counsel notes that (1) no evidence was introduced that respondent had any bond to the minor, (2) respondent had only four visits during the minor's life, (3) the foster placement was "meeting the minor's medical needs and working through the minor's development," and (4) the minor was bonded to the foster parent.

¶ 33        To begin, we find it necessary to clarify what evidence was entered at the best-interest hearing. Counsel argues that respondent had only four visits with N.D. during N.D.'s life and cites various reports that were submitted to the trial court at earlier permanency reviews. However, these reports were not entered into evidence at the best-interest hearing, and therefore, the trial court could not consider them in reaching its best-interest determination.

¶ 34        Instead, the evidence admitted at the best-interest hearing was limited to the testimony of the single witness that the State offered, Gooding. To that end, Gooding's testimony was scant and lacked specificity. She testified only that N.D. was placed with a relative, lived with his half-brother E.D., and was bonded to his foster mother. She also testified that E.D. had certain medical issues that the foster family was addressing, but this statement did not extend to N.D.

Confusingly, after discussing E.D.'s medical and educational needs, the State asked a series of questions about the potential for adoption of "this child" and "the minor." Neither Gooding nor the State clarified which child, E.D. or N.D., was being referenced in these statements.

¶ 35 At a best-interest hearing, "the trial court is constrained by the requirement that its decision be solely drawn from the evidence properly admitted." *Aiden M.*, 2025 IL App (5th) 250550-U, ¶ 16. Failure to present sufficient evidence at a best-interest hearing results in the State's failure to meet its burden of proof that terminating parental rights is in a child's best interest. See *id.* ¶ 23. Despite the limited evidence admitted at the best-interest hearing in the instant case, we nevertheless find it was enough to allow the trial court to conclude that it was in N.D.'s best interest to terminate respondent's parental rights. Gooding's testimony showed that N.D. was bonded to his foster mother; that he had permanency in his foster home, as it was the only one he had ever known; that he had familial ties in the home, as he lived there with his half-brother; and that his foster mother, having bonded to N.D., would likely wish to continue caring for him. Additionally, Gooding testified that E.D.'s medical and educational needs were being met and that the foster family wanted to adopt "the child." From this exchange, the trial court reasonably concluded that the placement was a preadoptive placement for N.D. and that he, along with E.D., was being cared for. We agree with counsel that no nonfrivolous argument may be made that the court's finding that it was in N.D.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 36 Our review of the record reveals no other potentially meritorious issues for review. Accordingly, we grant counsel's motion to withdraw.

¶ 37 III. CONCLUSION

¶ 38         For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 39         Affirmed.